1
2
3
4
5
6
7
8
9
10
11
12

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,                )
                                         )
                              Plaintiffs, )     Case No. 2:08-cr-00228-RLH-PAL
                                         )
vs.                                       )     **REPORT OF FINDINGS AND**
                                         )     **RECOMMENDATION**
RAYMOND EARL RAFUS,                       )
                                         )     (Motion to Suppress - Dkt. #10)
                              Defendants. )
_____ )

13        This matter is before the court on defendant Raymond Earl Rafus' ("Rafus") Motion to

14   Suppress Evidence (Dkt. #10) which was referred to the undersigned for a report of findings and

15   recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), and LR IB 1-3 and IB 1-4.  The court conducted

16   hearings on the Motion to Suppress on April 2, 2009, June 9, 2009, and June 26, 2008.  The court has

17   considered the Motion, the Government's Response in Opposition to Defendant's Motion to Suppress

18   Evidence (Dkt. #13), and the evidence adduced and arguments of counsel at the hearings.

19                                    **BACKGROUND**

20        Rafus is charged in an Indictment (Dkt. #1) with Possession of a Controlled Substance with

21   Intent to Distribute-Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(iii); Possession of

22   a Controlled Substance with Intent to Distribute-Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) &

23   (b)(1)(C); and Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

24   On Februay 19, 2009, Rafus filed the Motion to Suppress evidence recovered by members of the Clark

25   County Gang Task Force ("CCGTF") on August 20, 2008 following a traffic stop.  Pursuant to several

26   stipulations of counsel, the matter was set for an evidentiary hearing on April 2, 2009.  At that hearing,

27   counsel for Rafus stated that he believed there were discrepancies between the arrest report and the

28   government's Response to the Motion to Suppress.  Additionally, there was discussion regarding

1  defense counsel's efforts to obtain the clothing Rafus was arrested in, and that clothing was brought and

2  shown to the court by Officer Brian Farrington, a representative from the North Las Vegas Detention

3  Center.  At the conclusion of the hearing on April 20, 2009, counsel for Rafus requested a continuation

4  of the hearing to clarify certain issues that arose during testimony.  The court ordered Mr. Frankoff to

5  communicate with the government and advise the court whether continued proceedings were required.

6  Continued proceedings were then held on June 9, 2009.  The June 9, 2009 was adjourned and continued

7  to June 26, 2008.  Testimony concluded on June 26, 2009.

8         On June 30, 2008, Rafus filed a Motion for Leave to File a Supplemental Brief (Dkt. #38),

9  which the court granted.  See Dkt. #40.  Rafus filed Supplemental Points and Authorities (Dkt. #41) on

10  July 10, 2009, and the government filed a Supplemental Response (Dkt. #43) July 21, 2009.

11                                          **DISCUSSION**

12  **I.      The Parties' Arguments**

13         **A.      The Motion to Suppress Evidence (Dkt. #10)**

14         Rafus seeks to suppress narcotics recovered from his person following a traffic stop conducted

15  by CCGTF asserting the officers lacked reasonable suspicion to conduct an investigatory detention.

16  Rafus asserts that that CCGTF did not have sufficient information about him to form an individualized

17  reasonable suspicion that he was involved in criminal activity and that the area in which he was

18  observed entering and exiting a white van is not a high drug trafficking area.  Assuming *arguendo* the

19  police had reasonable suspicion to conduct a Terry stop, Rafus argues there was no reasonable

20  suspicion to believe he was armed or dangerous to justify a pat down.  Should the court find that there

21  was reasonable suspicion to stop and frisk, Rafus contends the officers exceeded the permissible scope

22  of a weapons pat down when they reached in his pants' pocket.  He argues his encounter with CCGTF

23  was not an investigatory stop, but rather, an illegal de facto arrest that violated his Fourth Amendment

24  rights.  For these reasons, Rafus asserts the narcotics recovered from his pocket should be suppressed.

25         **B.      The Government's Response (Dkt. #13)**

26         In response, the government asserts that Rafus' motion should be denied because there was

27  reasonable suspicion to conduct an investigatory stop.  The government argues that, based upon

28  CCGTF's training and experience, coupled with reasonable inferences drawn from their observations, it

2

1   was clear that Mr. Rafus was engaged in criminal activity.  Further, during Rafus' detention, only a

2   limited search for weapons was conducted during which time CCGTF discovered narcotics, giving

3   them probable cause to arrest Mr. Rafus.

4        **C.**   **Defendant's Supplemental Points and Authorities (Dkt. #41)**

5        The Supplemental Memorandum of Points and Authorities filed after the three evidentiary

6   hearings held in this case asserts that the officers' accounts of the incident that led to the defendant's

7   arrest have changed dramatically.  Rafus argues that a number of factual inconsistencies developed

8   during the evidentiary hearings casts extreme doubt about whether Rafus had been identified before he

9   was pulled over and arrested at the Taco Bell.  Rafus argues that officers who testified during the initial

10  hearing testified untruthfully about the events of his arrest and only corrected their testimony after the

11  defense obtained a video surveillance tape.  After the officers reviewed the surveillance tape, one or

12  more of them changed their testimony.  Rafus urges the court to find the officers' testimony lacks

13  credibility and to find he was stopped without reasonable suspicion.  Rafus also reiterates arguments

14  that the stop at the Taco Bell was a *de facto* arrest lacking probable cause and that the patdown of his

15  person violated his Fourth Amendment rights.  Rafus argues that the officers did not have reasonable

16  suspicion to believe that he was armed and dangerous at the time of the initial patdown and that the

17  scope of the patdown exceeded permissible Fourth Amendment limitations.  Rafus acknowledges that

18  officers may seize an object brought to their attention during an otherwise valid and limited patdown

19  search if its incriminating character is "immediately apparent" but contends Officer Gillespie's view of

20  less than an inch of a plastic bag from the defendant's front pocket was insufficient to meet the

21  "immediate apparent" test.  Finally, Rafus argues that the officers violated this court's exclusionary rule

22  instruction not to discuss their testimony with other witnesses and that the testimony of officers who

23  met with the prosecutor to view the surveillance tape from the Boulevard Mall between hearings should

24  be stricken and excluded.

25       **D.**   **The Government's Response (Dkt. #43)**

26       The government concedes that some of its witnesses had faulty memories about the details of

27  events that occurred almost a year prior to the evidentiary hearings which were conducted in this case.

28  However, the government argues that there is nothing in the record to support a finding that the

1   witnesses testified untruthfully, lied, or purposely deceived the court.  Rather, the government argues

2   that after Special Agent Gillespie had the opportunity to review the surveillance tapes, he took steps to

3   correct and clarify his prior testimony.

4        The government reiterates in its initial arguments that the initial contact with Rafus was an

5   investigatory detention supported by reasonable suspicion.  In the alternative, the government argues

6   that if the court deems the circumstances of the stop constituted a *de facto* arrest, it was based on

7   probable cause.  Finally, the government asserts that the witnesses did not violate the court's

8   exclusionary order by being in the same room when the video surveillance tape was produced between

9   hearings and shown to the government's witnesses.

10  **II.      Evidence Before the Court**

11      **A.      Testimony of Kevin Gillespie**

12       Mr. Gillespie has been a special agent with the Drug Enforcement Administration for the last

13  four years.  Prior to that, he worked as a police officer with the New York City Police Department.  He

14  is part of the CCGTF, which is a multi-agency organization that focuses on prosecuting drug dealers

15  and violent crimes.

16       During 2008, the task force was targeting its investigation on Kenneth Andrew Palmer, who is

17  also known as KAP.  Based upon information they received from a confidential informant ("CI"),

18  agents believed KAP was a crack-cocaine dealer.  The CI had made phone calls to KAP to purchase

19  drugs, and the CI informed agents that KAP usually dealt in the Sierra Vista/Cambridge area in Las

20  Vegas, near the Boulevard Mall.  The CI also informed agents that KAP sometimes drove a white

21  minivan, and the CI gave agents the license plate number.  The CI also said that KAP sometimes drove

22  a BMW or a Mercedes.

23       On August 20, 2008, the CI called KAP, ordered a quantity of crack-cocaine, and KAP arranged

24  to meet the CI at the Boulevard Mall on Maryland Parkway near the Old Navy between 1:30 p.m. and

25  1:40 p.m. that day.  The CI's call was monitored by two task force officers.  Agent Gillespie testified

26  that the Boulevard Mall is just east of the Sierra Vista/Cambridge area of Las Vegas, which is

27  sometimes referred to as "crack alley" because of the high density of crack deals, murder, and violent

28  crimes that occur there.  Gillespie testified that the name came from the name of a housing project in

4

1   that area with an alley in the middle, and that Boulevard Mall was part of the Sierra Vista/Cambridge
2   area.

3        On August 20, 2008, the task force arranged surveillance on the CI's drug buy from KAP.
4   There were a minimum of ten officers involved in the surveillance.  Four cars were in front of Old
5   Navy, and the remaining cars were driving in the parking lot to detect any counter-surveillance.  During
6   the surveillance, special agent Webster "called out" a red BMW in front of the Old Navy store that was
7   occupied by a black male.  Shortly thereafter, a white minivan arrived with the same license plates
8   mentioned by the CI.  The CI spotted the van, and an agent relayed its presence over the radio.  The van
9   drove south along the face of the mall and parked near the BMW leaving one empty parking space
10  between it and the BMW.  There were three occupants in the van.

11       Agents Gillespie and Webster were parked one row over from the van observed the driver of the
12  BMW exit the vehicle and enter the rear passenger door of the white van.  The driver remained in the
13  van for approximately two minutes, left the van, dropped a hand-sized object on the ground, and picked
14  it up.  Based upon his training and experience, Gillespie believed a narcotics deal had just occurred in
15  the white van.  Gillespie testified that the driver of the BMW was Defendant Rafus.

16       Gillespie recognized Rafus because on July 14, 2008, members of the task force had a prior
17  encounter with Defendant Rafus at the Shelter Island Inn Extended Stay Apartments, located at 3770 S.
18  Swenson, in the Sierra-Vista/Cambridge area, during the execution of a search warrant.  Defendant
19  Rafus was arrested because he was the sole occupant of the unit.  During the search of the unit, law
20  enforcement discovered three handguns and approximately $13,000.  Gillispie was unsure whether any
21  narcotics were discovered in the search.  Gillispie testified that he learned about the search of Rafus'
22  apartment after the search was conducted during a debriefing session, and he was told that Rafus and
23  another agent struggled over a firearm that Rafus tried to grab, which took multiple law enforcement
24  officers to subdue Rafus.

25       On August 20, 2008, the same agents involved in the search of the Shelter Island Apartments
26  were present, and someone recognized Rafus and "called out" over the radio that the driver of the
27  BMW was Rafus.  As a result, although Rafus was not a target of the investigation on August 20, 2008,
28  four units followed Rafus out of the Boulevard Mall parking lot and westbound on Twain Avenue.

1    Rafus drove to a Taco Bell restaurant about a mile away and went to the drive-thru.  Gillespie testified

2    that during the drive to Taco Bell, he did not lose sight of the BMW.  Agents stopped Rafus at the exit

3    of the drive-thru because they believed he had engaged in a narcotics purchase.  One unit, that had

4    pulled in directly after Rafus, activated its emergency lights, and another vehicle pulled in front of the

5    BMW, blocking Rafus' exit from the BMW.  Although none of the task force agents was uniformed,

6    they were wearing hang badges to identify themselves as law enforcement.

7         Gillespie testified that he and other task force agents held Rafus at gunpoint.  Rafus put his

8    hands out the window.  Agents removed Rafus from the BMW and placed him in handcuffs.  Gillespie

9    stated that Rafus was not arrested but was detained at gunpoint and in handcuffs based upon their prior

10   experience with Rafus on July 14, 2008.  Rafus was read his <u>Miranda</u> rights and patted down for officer

11   safety.  Gillespie checked Rafus' waistband and the front and back of his pants for weapons, lifting his

12   shirt in the process.

13        During the patdown, Gillespie felt a hard object in Rafus' front left pants' pocket.  Gillespie

14   testified he could see a clear ziploc plastic bag sticking out of the same pocket.  Based upon his earlier

15   observations in the Boulevard Mall parking lot and the patdown, Gillespie testified that he suspected

16   Rafus had crack in his pocket.  When the ziploc bag was removed from Rafus' pocket, it contained both

17   crack and powder cocaine.  Rafus was placed under arrest after the narcotics were discovered.

18   Although there were four agents present at the Taco Bell, only two of them had direct contact with

19   Rafus.

20        In February 2009, Gillespie testified that he was called by the prosecutor, Amber Craig.  He was

21   on surveillance during the call, and he did not have the reports from Rafus' arrest with him nor had he

22   reviewed them.  Gillespie testified that when he was speaking with Ms. Craig, he was mistaken about

23   the case she was inquiring about.  He stated that he did not give her questions due consideration, and he

24   confused the Rafus investigation with another matter in which he was the case agent.  Gillespie testified

25   that is why he told Ms. Craig that Rafus was not handcuffed, and no guns were drawn when Rafus was

26   stopped at the Taco Bell on August 20, 2008.  Details of the stop of Rafus are not contained in the arrest

27   report.  Gillespie stated that the facts as he relayed them on the witness stand are true.

28   / / /

6

On cross-examination, Gillespie said he was trained at the DEA Academy in Quantico, Virginia and he learned the significance of accurately preparing reports.  It was possible for an officer to be confused, and that copious notes of an investigation are important.  Agents commonly debrief after an arrest about who saw what, and they often create a timeline of events during the arrest.  Agents debriefed after Rafus' arrest.  Gillespie did not recall who was present at the debriefing session, but the majority of task force officers involved in the investigation were there.  Gillespie did not see or review the arrest report in this case.  Officer Gorup–who was not involved in Rafus' arrest at Taco Bell–prepared the report based on his observations at the Boulevard Mall and input from other task force members who were present at Taco Bell.  Gillespie testified that during the debriefing, agents told Officer Gorup what they considered to be relevant, important, and significant.

Gillespie testified that he believes it was Officer Gorup who identified Rafus over the radio on August 20th as the man who was involved in a scuffle with agents on July 14th.  The July 14 incident, although relevant, is not mentioned in the arrest report.  Gillespie did not tell Gorup that Rafus was stopped at gunpoint because that it is such a "common practice" because drug dealers have a propensity to carry guns and be violent.  Gillespie testified he did not think it was significant to report that Rafus was stopped at gunpoint.

When questioned about the discrepancies between the facts contained in the government's Response and his testimony on the witness stand, Gillespie testified that it is common practice for Assistant U.S. Attorneys to contact case agents.  Gillespie could not recall the specific details of his conversation with Ms. Craig.  He thought she was calling about another Sierra Vista/Cambridge case on which he was the co-case agent and provided erroneous information about this case.  Gillespie is not a co-case agent on the Rafus case.

Gillespie testified that task force agents received did not receive any information about Rafus from the CI, and in fact, Rafus' appearance at the Boulevard Mall on August 20, 2008 was a surprise to the task force agents.  Gillespie identified the area known as "Crack Alley" to be west of the Boulevard Mall and Maryland Parkway and adjacent to the mall.  East of the mall still has a lot of crime, but that area is not known as "Crack Alley."

/ / /

1    On August 20, 2008, there were approximately ten law enforcement officers present at the

2    Boulevard Mall.  Only one vehicle was assigned a specific location; the remainder were mobile, and

3    "called out" their location on their car radios.  The car radios in the task force officers' cars do not

4    communicate with Las Vegas Metropolitan Police Department's dispatch unit.  On August 20, 2008,

5    the mall was open, and there were cars in the parking lot.  Gillespie testified that the spots were more

6    full near the stores and emptier further west in the parking lots.  The white van the confidential

7    informant had identified as KAP's vehicle entered the parking lot from the north, drove south along the

8    store fronts, and parked near the BMW near Old Navy, just north of the mall's parking garage.

9    Officer Webster was the first law enforcement officer to arrive on the scene on August 20, 2008.

10   He parked in a predetermined spot, and called out other cars in the area with occupants in them.  There

11   were cars called out before and after Rafus' BMW was called out.  Gillespie testified that there was

12   "nothing special" about the red BMW except that it happened to be parked near a surveillance vehicle.

13   Initially, Gillespie's vehicle was mobile in the Boulevard Mall's parking lot.  When the white

14   minivan entered the parking lot, Gillespie followed it–maintaining a distance of approximately five to

15   eight car lengths–toward Old Navy, and he parked one aisle north of where the minivan was parked.

16   Gillespie saw Rafus leave the BMW and get into the rear passenger door of the minivan.  He testified

17   that someone, though he could not recall who, recognized Rafus from the July 14, 2008 incident either

18   before or after Rafus got out of the van.  As Rafus exited vehicle, Gillispie saw Rafus drop and retrieve

19   an object.

20   When Rafus left the mall, another officer followed the BMW out of the parking lot to a Taco

21   Bell about a mile away.  Officer Gorup ordered the stop on Rafus.  The four law enforcement vehicles

22   that headed to Taco Bell switched to a different radio frequency to communicate with one another.

23   Because law enforcement knew KAP to be a drug dealer, there was a "combined understanding" that

24   Rafus would be stopped.

25   Gillespie testified that Rafus was wearing shorts, sneakers, and a t-shirt or tank top, and it was

26   evident he was not carrying kilos of narcotics on his person.  Gillespie admitted that the criminal act of

27   purchasing narcotics was completed at the Boulevard Mall, but Rafus was stopped at Taco Bell for

28   being in possession of narcotics.  At Taco Bell, Gillespie initiated his lights and approached the car's

8

driver window with his gun drawn and pointed in Rafus' general direction.  Gillespie testified that Rafus was not free to leave, and he could not have driven or walked away.

In response to the court's questions, Gillespie testified that in conducting a patdown of Rafus, he held the chain connecting the two handcuffs, and examined Rafus' waistband.  Then, he grabbed and felt Rafus' pocket, and finally patted down the legs of Rafus's pants to the shoe area.  He noticed a bulge in the front left pocket of Rafus' pants, which based on his prior observations and his training and experience, he believed to be crack.  He also noticed about one inch of a plastic bag sticking out of Rafus' pocket.  He admitted that initially Rafus' pocket was concealed by his shirt, but he lifted the shirt because it was "hung up on" the handcuffs.

Agent Gillespie was recalled at the continuation of the evidentiary proceedings held on June 26, 2009.  Following his testimony on April 4, 2009, Gillespie traveled back to the Boulevard Mall to observe and drive through the parking lot where the events of August 20, 2008 occurred.  Gillespie also attempted to learn whether there was any surveillance video of the parking lot.  He found out that there was video and that depending upon which DVR it is recorded on, the Boulevard Mall keeps it for between sixty and 120 days.  After April 4, 2009, law enforcement called the security office of the Boulevard Mall to see how long it kept a copy of the surveillance video.  They were told that video was kept for thirty days.

On June 9, 2009, Gillespie learned that defense counsel had obtained a copy of the surveillance video, and he attempted to obtain a copy as well.  He went to the security office of the Boulevard Mall and obtained a copy of the surveillance video after he obtained an administrative subpoena.  Gillespie actually obtained two videos–one taken from a vantage point far north in the parking lot near Sears and the other in front or near the Old Navy.  The video taken from near the Sears did not capture any of the events that occurred near the white van and the red BMW.  The second video, taken from near the Old Navy store, captured the red BMW, the white van, and several of the surveillance units, but it not capture the transaction between Rafus and KAP because the video camera pans across the parking lot and is not fixed on one spot.  Also, because the digital video is compressed to save DVR space, some seconds are not captured.  The video is time stamped.

/ / /

9

1    Gillespie watched the video with Miss Craig on June 23, 2009 with Prochnow, Webster and IT

2    personnel from the U.S. Attorney's Office.  He stated that after watching the video, his memories of the

3    events on August 20, 2008 changed.  Gillespie stated that he was not north of the red BMW as he

4    previously testified, but rather, he was on the south side of those vehicles.  Gillespie was traveling

5    throughout the parking lot on mobile surveillance in a white pickup truck.  Miss Craig then reviewed

6    the video with Gillespie, asking him to identify his vehicle, the red BMW, the white van, and other

7    surveillance vehicles throughout.  The video shows that the white van parked directly to the right of the

8    red BMW in the spot directly next to it.  Gillespie recalled that Special Agent Webster was parked

9    southwest one parking row from the red BMW.  There was no car parked next to Webster's vehicle.

10   Gillespie drove by the red BMW because someone requested him to.  He observed one

11   individual inside the red BMW.  Webster never moved from the spot he was parked in, and neither did

12   the red BMW until it left the parking lot.  When the white van enters the parking lot, the video shows

13   Gillespie a few car lengths behind the van, and there are three cars between them.  This testimony is

14   inconsistent with his previous testimony–wherein he stated he was one car back from the van.  Gillespie

15   then answered various questions concerning the location of the red BMW, the white van, and the

16   surveillance vehicles based on still photographs prepared from the video.

17   On cross-examination, Gillespie admitted that when Ms. Craig first asked him about this case,

18   Gillespie gave her some wrong information because he confused this case with another he was working

19   on.  He then admitted that his testimony on April 2, 2009 also contained several mistakes concerning

20   his memory of the events that occurred on August 20, 2008.  He admitted he returned to the Boulevard

21   Mall after he first testified because he thought he might have been mistaken about his testimony

22   regarding his position in the lot on August 20, 2008.  He stated because he did not recall seeing the

23   parking structure, he thought he may not have been facing south in the parking lot.  He spoke with Ms.

24   Craig about his mistaken testimony, but he could not recall when.

25   Defense counsel inquired about which side of Gillespie's vehicle the red BMW was on.  The

26   record is fairly unclear about whether the red BMW's driver door was on Gillespie's left or right hand

27   side.  Gillespie conceded that because he was mistaken about some things, there are other matters he

28   may be mistaken about as well.  Gillespie was then questioned about his previous testimony on April 2,

10

1    2009.  Gillespie conceded he was mistaken about the following: (a) the number of cars between his and

2    the white van when the white van entered the parking lot; (b) the spot the white van parked in; and

3    (c) where he was in the parking lot when Rafus exited his vehicle and got into the white van.  Gillespie

4    also testified on April 2, 2009 that he never lost sight of the red BMW.  On June 26, 2009, he testified

5    that he did lose sight of the vehicle because he had to catch up to it, but other surveillance vehicles

6    never lost sight of the red BMW.

7            On re-direct, Gillespie prepared a diagram of the Boulevard Mall and the location of the red

8    BMW, the white van, the various surveillance vehicles, and his path through the parking lot.  He stated

9    that the changes in his testimony made after watching the video did not change the actual observations

10   he made on August 20, 2008.

11          On re-cross, defense counsel questioned Gillespie concerning the diagram he prepared on re-

12   direct.  Gillespie testified that on August 20, 2008, there were cars parked in Gillespie's line of sight

13   between where his vehicle was located and where the red BMW was parked.  He stated that his view

14   was not obstructed by these cars.  He does not recall whether or not he parked his vehicle to observe

15   Rafus exiting the red BMW and entering the white van.  Mr. Frankoff then asked Gillespie about the

16   still photographs made from the surveillance video.  Gillespie marked various vehicles–including the

17   red BMW, the white van, and various surveillance vehicles.

18   **B.    Testimony of John Kruthauet**

19          Kruthauet is currently employed as a special agent with the DEA and has been so employed for

20   the last thirteen years and has either been assigned to Las Vegas, Nevada or Afghanistan.  Currently, he

21   works in Las Vegas in the major violators group, which investigates large scale drug operations.  Prior

22   to that, he worked with the CCGTF.  He was assigned to the CCGTF during the events at issue in this

23   case.  He participated in Rafus' arrest on July 14, 2008 on August 20, 2008.  He testified that he had

24   personal contact with Rafus on July 14, 2008 and was involved in the execution of a search warrant at

25   the Shelter Island Apartments.

26          On July 14, 2008, agents entered Rafus' unit.  Rafus came through the bedroom and grabbed

27   one of the agent's firearms so forcefully that the agent had to discard the weapon and use his secondary

28   weapon.  He testified that it took four or five agents to subdue Rafus and handcuff him.  On August 20,

11

2008, Kruthaupt was acting in a surveillance capacity at the Boulevard Mall and was involved with Rafus' arrest at Taco Bell.  He believed it was officer Billy Marks who recognized Rafus from the July 14, 2008 arrest because it was Billy Marks' weapon that Rafus attempted to grab on that date.

On cross-examination, Kruthaupt testified that Officer Marks was patrolling the mall in a parked police car somewhere south of where Kruthaupt was surveilling.  He testified that this may have been how Marks identified Rafus–because he could have run a license plate check on the BMW's plates as he was in a marked police cruiser.  He testified that he could not be sure that it was Marks that "called out" the identification of Rafus because sometimes multiple people talk on the radio at the same time, and it is difficult to distinguish voices. Kruthaupt testified that he witnessed someone exit the white van and enter the BMW.  He also witnessed this individual drop something and bend down to pick it up.

In response to questions by the court, Kruthaupt testified that as a result of seeing Rafus in the Boulevard Mall parking lot, the task force broke off four units to follow Rafus and left the remaining officers at the Boulevard Mall to pursue their investigation of KAP.  The officers decided to stop Rafus because, based on their training and experience, it appeared he was involved in a drug transaction.

### C.    Testimony of Cindy Prochnow

Cindy Prochnow is employed as a special agent with the DEA and has been so employed for the last four years.  Prior to joining the DEA, Prochnow worked as a deputy sheriff in Madison, Wisconsin. She is currently working on the CCGTF, and she is the case agent on the Rafus case.  She was present at the last suppression hearing and heard the testimony of all witnesses.

On August 20, 2008, she was situated on the outside perimeter of the mall, near the Applebee's restaurant.  Detective Anton Gorup and the CI were in her vehicle with her.  She and Gorup were in the vehicle monitoring the radio during the surveillance.  She testified that she remembers someone calling out over the radio about the possible presence of Rafus at the Boulevard Mall on August 20, 2008.

After the first suppression hearing in this case, Assistant U.S. Attorney Amber Craig called Prochnow and asked which task force officer called out Rafus over the radio.  Prochnow did not recall, and she contacted each officer on the arrest report to see who recognized Rafus and called him out over the radio.  Detective Gorup told Prochnow that it was probably him who called Rafus out, but he could not be one hundred percent certain.

12

On cross-examination, Prochnow testified that she did not make any notes or reports concerning her contact with the officers.  She either contacted them in person or over the phone over a period of time.  She spoke with Ms. Craig to advise her of the status of her inquiry and stated that thus far, none of the officers remembered calling out Rafus.  She again spoke with Ms. Craig about a week after the suppression hearing and told her that Detective Gorup said he was probably the one who called out Rafus.

Prochnow testified that on August 20, 2008, she was part of the surveillance team at the Boulevard Mall, but she could not directly observe Rafus or KAP's white van because she was far away, and the view was obstructed by trees and other cars in the parking lot.  The car she, Gorup, and the CI were in was parked at the far north end of the mall's parking lot.  She was seated in the driver's seat, and Gorup was in the passenger seat.  Neither of them left their vehicle during the surveillance, and Prochnow was not aware of any officers using video recording devices on that day.  She left the spot near Applebee's around 2:00 p.m. after KAP was arrested, and Rafus had left the mall parking lot.

Prochnow testified that she knows the officers who are part of the task force, and she has worked with all of them on more than one occasion.  She is familiar with both the way they look and the sound of their voices.  Although she does not remember anyone in particular calling Rafus out over the radio, including Gorup, she remembers "having it in her head" that the man in the red BMW was possibly Rafus.

On re-direct, Prochnow acknowledged that she spoke with Ms. Craig on several occasions about several different matters.  She stated that Gorup is currently assigned to Las Vegas Metropolitan Police Department's SWAT unit, and he took longer than other officers to respond to Prochnow's phone call regarding Rafus.  She "had no idea" when Ms. Craig contacted defense counsel concerning which officer called Rafus out on the radio on August 20, 2008.

Prochnow was parked near the Applebee's because she did not want anyone to see her or the CI, who was familiar with the target of the investigation.  There was a lot going on at the scene–there were numerous people talking on the radio, and when Rafus arrived unexpectedly, the task force officers had to devise a new plan.  Prochnow was involved in executing the search warrant on July 14, 2008, and she saw him on that date.

13

### D.   **Testimony of Detective Anton Gorup**

Detective Gorup is currently employed on the Las Vegas SWAT team of the Las Vegas Metropolitan Police Department ("LVMPD").  He has worked with LVMPD for the last fourteen and a half years.  He joined the SWAT team in November 2008.  Prior to that, he was assigned to the CCGTF and was involved in the investigation of Rafus.

On July 14, 2008, Gorup was involved in the execution of a search warrant at the Shelter Island Apartments and was in direct contact with Rafus.  He and other officers fought with Rafus after Rafus grabbed an officer's gun.  Gorup testified that he and other officers struggled to get Rafus to the ground.  The July 14, 2008 search warrant was obtained from information provided by the CI, who Gorup usually communicates with over the phone or in person.  The CI identified Rafus' vehicle as a red BMW with California license plates.  The CI asked Gorup if he had searched the red BMW.  Gorup testified that he saw the red BMW with California license plates in the parking lot of Rafus' apartment on July 14, 2008, but he did not search it because there was "no reason" to.

The investigation of KAP also relied on information from the CI.  The CI told Gorup that KAP was selling drugs, and he also identified the vehicles KAP drove.  The CI set up a controlled buy with KAP over the phone, and they agreed to meet on August 20, 2008 at the Boulevard Mall.  Gorup set up surveillance in that lot at the north end of the parking lot.  He was monitoring the radio and directing other task force officers.  He was parked near Desert Inn Road and Maryland Parkway near an Applebee's restaurant.  During the surveillance, he remained inside the vehicle.  He saw a white minivan enter the parking lot.

Agent Christian Webster was in the primary surveillance role because he was in the best position to view the white minivan.  Webster called out over the radio that he was parked near Old Navy near a red BMW, and an occupied white van.  Gorup was not able to see any of this activity.  When he heard there was a red BMW with California plates occupied by an African-American man, he called out over the radio that it was possibly Rafus in the car "because it was an officer safety issue."  Gorup stated that Rafus' involvement on August 20, 2008 was not planned, and as a result of his presence, all units had to readjust.

/ / /

14

1    Gorup wrote the report in this matter, and he testified that the reports do not always contain
2    every detail of an investigation.  The report from August 20, 2008 did not mention that someone had
3    called out Rafus over the radio.  He stated that the report from July 14, 2008 did not mention the CI's
4    tip that Rafus drove a red BMW with California license plates because that was "intelligence."  Gorup
5    said that intelligence is only documented if it is verified.  He ran the license plate (or had them run), and
6    they did not come back as belonging to Rafus.  He testified that there is no report of the CI's statement
7    that Rafus drove a red BMW with California license plates, there is no report that he ran or had the red
8    BMW's plates run, and there was no photo taken of the presence of the red BMW in the parking lot on
9    July 14, 2008.

10   Gorup called out a white van around 1:40 p.m. as it was driving south through the Boulevard
11   Mall parking lot.  He stated that he was parked in an SUV near the Applebee's restaurant which was
12   approximately several hundred yards away from the red BMW and white van.

13   Gorup testified that between June 9, 2009 and June 26, 2009 (the two dates on which he
14   testified), he did not review the CI file to see whether he documented the CI's information regarding a
15   red BMW belonging to Rafus.  On July 14, 2008, he did not take any photo of the red BMW at the
16   Shelter Island Apartment.  He also stated that the CI did not know Rafus' legal name, but was only
17   aware of the moniker "Jack Move."  Gorup could not recall whether the moniker was included in the
18   affidavit supporting the search warrant or in the report documenting the execution of the search warrant.
19   Gorup stated that often times a moniker is included in these reports, but not all of the time.  Upon
20   reviewing the search warrant and the reports prepared in connection with their execution, Gorup
21   testified that there was no mention of a red BMW, Rafus, or the moniker "Jack Move."  Gorup testified
22   that the report refers instead to an individual named "CD."  Gorup also testified that there were no
23   photos taken of the red BMW on July 14, 2008, that there was no record of his having run the license
24   plate on the red BMW at that time, and when Rafus was arrested on July 14, 2008, he did not have any
25   BMW keys on his person.  Gorup stated that following the execution of the search warrants on July 14,
26   2008, Gorup had no reliable information to connect a red BMW to Rafus.

27   Gorup testified that he did not speak with the CI between June 9 and June 26, 2009.  He stated
28   that he had spoken with Ms. Craig at a meeting which Prochnow, Gillespie, and Webster were present.

15

1   At that meeting, they discussed the surveillance video and the CI being in Gorup's car when he called

2   Rafus out over the radio, and about the events at the Boulevard Mall. Gorup then testified that he did

3   not speak with those agents regarding these matters, but upon inquiry from the court, he stated he spoke

4   with Ms. Craig about coming to court on June 26, 2009, questions she thought the defense would ask

5   about a red BMW, the events at the Boulevard Mall, and what Gorup announced over the radio.  When

6   asked about what was discussed with the other agents, Gorup could not recall specifics.

7        Gorup also stated that although on July 14, 2008, Rafus had been combative and taken a gun

8   from a task force officer, Rafus was not charged with battery or assault on a police officer.  There was

9   also no additional request made of Judge Williams regarding Rafus or the ref BMW.

10        Gorup testified that on August 20, 2008, he was parked near the Applebee's in the north end of

11   the Boulevard Mall parking lot in an SUV and did not observe any of the incident involving Rafus and

12   a white van.  Gorup testified that Special Agent Webster identified the red BMW over the radio initially

13   around 1:40 pm.  Gorup heard Webster call out the red BMW.  Webster also stated that it had

14   California license plates.  Although a patrol car was around the corner and could have run the plates, the

15   license plate number of the red BMW was not called out.  When Gorup testified on June 9, 2009, he did

16   not mention that Webster called out the vehicle and the state from which the license plates were issued.

17        Gorup also testified that it was the CI who said the red BMW was Rafus' car.  Previously,

18   however, Gorup testified that it was he who recognized the red BMW might have been Rafus' car.

19   Gorup clarified that the CI said it, he recalled the incident at the Shelter Island Apartments on July 14

20   2008, and then he called out the possibility that it was Rafus' car for officer safety.  Gorup conceeded

21   that this statement by the CI was not in any report nor did he testify to it on June 9, 2009.  Gorup also

22   stated that Prochnow was in the car when the CI identified the red BMW as Rafus' and she was not

23   having trouble hearing or understanding.  Gorup testified that he did not mention the CI's statement in

24   his testimony on June 9, 2009 because he was not directly asked about it.  He said he informed Ms.

25   Craig that the CI identified the red BMW on June 23, 2009 at the pretrial conference.

26        Gorup testified that after Rafus was arrested a SCOPE report was run on July 15, 2008 and that

27   it revealed neither "CD" or "Jay Move" or "Jack Move" as a moniker for Rafus.  SCOPE is an

28   identification system that lists a person's name, date of birth, social security number, physical

1  descriptors, FBI number, place of birth, last known address, his or her prior arrest history in Nevada,

2  and whether the person is registered felon in any other state. Gorup stated that CD was not listed

3  because that is a different person than Rafus.  CD was not in the apartment when officers executed a

4  search warrant on July 14, 2008.  Gorup has no independent evidence, aside from the CI's statement,

5  that Rafus uses the moniker "Jack Move."

6        On re-direct, Gorup stated that neither he nor anyone else he was with searched a red BMW on

7  July 14, 2008 because they could not link that car to Rafus or corroborate the CI's statement about the

8  car's ownership.  Gorup did not document the red BMW, and he had no idea that it would become

9  significant at a later date.  He clarified that on August 20, 2008, after the red BMW was called out, the

10  CI said "that's Jack Move's car."  Gorup stated that on July 14, 2008, after executing the search

11  warrants at the Shelter Island Apartments, the CI told him about a red BMW, and Gorup verified that it

12  was in the parking lot on that date.  Gorup called out the CI's statement over the radio because based on

13  his prior experience with Rafus on July 14, 2008, it was an issue of officer safety.  After Rafus was

14  arrested on August 20, 2008, Gorup discovered that Rafus was not the owner of the red BMW, but his

15  girlfriend was.  There was also a lienholder on the car in California.

16        On re-cross, Gorup stated he cannot identify Rafus as "Jack Move" because he only knows

17  Rafus by his legal name.  He has no way of knowing whether or not the person the CI identified as

18  "Jack Move" is Rafus in response to questions by the court.

19        Upon examination by the court, Gorup stated that after Rafus was arrested at Taco Bell, the red

20  BMW was impounded, taken to the DEA office where it was processed pending forfeiture.  At DEA,

21  law enforcement ran a licence plate check and confirmed the registered owner.  The red BMW was

22  subsequently released to Rafus' girlfriend.

23        **E.**    **Testimony of Christian Webster**

24        Webster is currently employed as a special agent with U.S. Immigration and Customs

25  Enforcement and has been so employed for the last five years.  He is currently assigned to the CCGTF.

26  He has worked on that assignment for the last two years.  He was working with the CCGTF on both

27  July 14, 2008 and August 20, 2008 and was involved with the investigation of Kenneth Andrew Palmer.

28  He was involved with executing search warrants on July 14, 2008, though he did not execute the search

1  warrant for the apartment in which Rafus was present.  He first made contact with Rafus after Rafus'

2  arrest on July 14, 2008 at the Clark County Detention Center, where he and Task Force Officer Gross

3  served a buccal swab warrant to obtain DNA from Rafus.

4       Webster was also involved with the surveillance at the Boulevard Mall on August 20, 2008.  A

5  controlled buy was set up with a CI and Kenneth Andrew Palmer, who the CI said would arrive in a

6  white van.  On August 20, 2008, Webster arrived at the Boulevard Mall around 1:30 or 1:45 p.m. in a

7  silver sedan.  He parked near the Old Navy store on the west side of the mall.  He was the "primary

8  eye" surveillance because just near where he parked, a red BMW parked and was called out as a

9  potential target vehicle.  Webster was parking facing southeast.  He saw the red BMW out his driver's

10 side window facing northeast in the parking lot.  His attention was drawn to the red BMW because it

11 was called out as a vehicle of interest with California license plates.  He noticed there was someone

12 parked in the red BMW, and they were not getting out, which he thought was strange because it was in

13 the middle of the day and hot outside.  He notified the other task force members about the red BMW.

14      He asked Gillespie to drive by the car and confirm that it had a California plate.  Gillespie did

15 so.  Webster's vehicle was separated from the red BMW by a travel lane, and he was between forty and

16 fifty feet from the red BMW.  In order to view the red BMW, he leaned his seat back and turned to his

17 left side to look at it over his shoulder.  There was nothing obstructing his view of the red BMW.  He

18 used his binoculars to view the BMW's license plate.  He heard that the white van had arrived over his

19 radio, and he saw it park next to the red BMW with its passenger side next to the BMW's driver's side.

20 Both the BMW and the van were facing in the same direction.  He saw three occupants in the white van.

21 After the van parked, fifteen seconds later, Rafus exited the BMW and entered the van through the

22 passenger door.  He testified that he knew he had seen Rafus before, but he could not identify him.

23      Rafus was in the van for approximately twenty or thirty seconds.  The driver of the van, later

24 identified as Kenneth Palmer, turned around, and Rafus leaned in.  Rafus then exited the van and

25 dropped what appeared to be a plastic bag.  Rafus looked left and right, picked up the bag, put it in his

26 shorts, and got back into the red BMW.  Based on his training and experience, he believed he witnessed

27 a narcotics transaction.  He also stated that the bag was consistent with narcotics packaging.  He knew

28 / / /

1    Kenneth Andrew Palmer was there specifically to do a drug deal with the CI.  After observing these

2    events, he notified other members of the task force over the radio.

3            After Rafus re-entered the red BMW, he reversed out of his parking spot, drove toward the Old

4    Navy, and turned south through the parking lot.  None of the task force members expected Rafus'

5    presence at the controlled buy on August 20, 2008.  The surveillance plans the task force set up had to

6    be changed as a result of what Webster observed in the parking lot.

7            Webster met with Ms. Craig on June 23, 2009 to watch the surveillance video from the

8    Boulevard Mall taken on August 20, 2009 with Prochnow, Gillespie, and an IT personnel from the U.S.

9    Attorney's Office.  Webster's recollection of events changed after viewing the video on June 23, 2009,

10   but nothing any other task force member said during the meeting influenced his testimony.  Ms. Craig

11   then viewed the surveillance video with Webster, and he identified the red BMW, the white van, his

12   vehicle, and Gillespie's vehicle in the video.  Ms. Craig then examined the still photographs made from

13   the surveillance video, and he identified the same vehicles in those photographs.

14           On cross-examination, Webster stated that he works with the other task force members on an

15   everyday basis, and he is familiar with procedures employed to execute search warrants.  Webster stated

16   that in addition to a report prepared on a LVMPD or DEA form, he also prepared a report on an ICE

17   form.  Webster stated that the reports contain a section for vehicle indexing, which is used to reference

18   vehicles that may or may not be pertinent to the report.  He testified that if a red BMW was related to a

19   person he arrested, that vehicle would be indexed on the report of the arrest in order to reference the

20   events of the arrest.  Vehicle indexing also allows law enforcement to determine who a car belongs to,

21   and it ensures that a vehicle is returned to its lawful owner.

22           Webster was present at the Shelter Island Apartments on July 14, 2008 executing search

23   warrants with the CCGTF.  He did not enter the apartment from which Rafus was arrested, nor did he

24   see Rafus that night.  He saw Rafus at the Clark County Detention Center shortly after his arrest on July

25   14, 2008 with TFO Gross.  He was in a hallway with Rafus, approximately two or three feet away from

26   Rafus.  Although he did not recognize the driver of the BMW as Rafus, Webster knew he had seen the

27   driver before.  He had never seen the red BMW before.  Webster did not recall who called the red

28   BMW as a vehicle of interest.  He did not run the license plates on the red BMW.

Although he used the binoculars to observe whether the red BMW's license plate was a California plate, he did not continue to observe the red BMW through the binoculars.  The radios used by CCGTF are push-to-talk radios, and there is no record kept of what is said.

Webster testified that when he viewed the surveillance video, they discussed where each other's vehicles were located.  Webster could not recall anything else that was discussed when he and the other agents watched the surveillance video with Ms. Craig on June 23, 2009.

Defense counsel played the surveillance video and asked Webster questions regarding the location of the red BMW, the white van, and the surveillance vehicles.  He stated that the red BMW was called out before he parked his vehicle, and the red BMW was parked before Webster parked his car.  There was very little traffic that drove down the travel lane while he was observing the red BMW.  He noticed the slider passenger door of the white van open because the rail on the top of the car appeared to move.  He called out a black male was exiting the red BMW and entering the van.  He told the other officers about Rafus dropping a bag, but he could not explain why that detail was not in the arrest report.  He testified that it was a small plastic bag, and he only saw the top of the bag.  He described it as plastic sticking up from a knot.  Webster testified he saw about two inches of plastic.  Webster did not see the plastic bag in Rafus' hand until Rafus picked it up from the ground.

After Rafus left, Webster remained near the white van.  Law enforcement spoke to the occupants of the white van, and they denied selling Rafus drugs.  After refreshing his recollection with the Report of Investigation, Webster recalled that due to a lien balance on the red BMW, it was released to the bank and not to Rafus' girlfriend.

On re-direct, Webster stated he only spent about five or ten minutes with Ms. Craig before he testified.  He also stated that the red BMW could have been in the Shelter Island parking lot, but he did not look for it.  He stated he was not involved in releasing the red BMW to its owner and he does not have personal knowledge regarding to whom the vehicle was turned over.

**III.     Applicable Legal Authority & Analysis**

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Fourth Amendment protects reasonable and legitimate expectations of privacy.  Katz v. United States,

1  389 U.S. 347 (1967).  The Fourth Amendment protects "people not places."  Id.  Evidence obtained in

2  violation of the Fourth Amendment and evidence derived from it may be suppressed as the "fruit of the

3  poisonous tree."  Wong Sun v. United States, 371 U.S. 471 (1963).

4       **A.**    **The Initial Encounter**

5       Rafus argues he was seized and detained without reasonable suspicion during his initial contact

6  with law enforcement.  The government contends the initial contact between Rafus and CCGTF was

7  not a arrest, but rather an investigatory Terry stop for which CCGTF had reasonable suspicion to detain

8  and question Rafus.

9       For Fourth Amendment purposes, a seizure occurs "when the officer, by means of physical force

10  or show of authority, has in some way restrained the liberty of a citizen."  Terry, 392 U.S. at 19, n.16.

11  Justice Stewart's opinion in United States v. Mendenhall, 446 U.S. 544 (1980), developed what the

12  courts have referred to as the Mendenhall test for when a seizure occurs: "[A] person has been 'seized'

13  within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding

14  the incident, a reasonable person would have believed that he was not free to leave."  Id. at 554.  Rafus

15  was stopped and ordered out of his vehicle at gunpoint at the Taco Bell by several officers.  He was

16  clearly seized for Fourth Amendment purposes.  The government argues the seizure was an

17  investigatory detention based on reasonable suspicion.  Rafus asserts he was seized without reasonable

18  suspicion and that the seizure amounted to a *de facto* arrest.

19       **1.**    **Investigatory Detentions**

20       An investigatory detention, under the Fourth Amendment, must be supported by "reasonable

21  suspicion" that criminal activity may be afoot.  United States v. Arvizu, 534 U.S. 266, 273 (2002).  In

22  assessing whether an officer has reasonable suspicion to conduct an investigatory detention, reviewing

23  courts look at the "totality of the circumstances" of each case to see whether the detaining officer had a

24  "particularized and objective basis" for suspecting legal wrongdoing.  Arvizu, 534 U.S. at 273.  "An

25  investigatory stop must be justified by some objective manifestation that the person stopped is, or is

26  about to be, engaged in criminal activity."  United States v. Cortez, 449 U.S. 411, 417 (1981); see also

27  United States v. Sigmond-Ballasteros, 285 F.3d 1117, 1121 (9th Cir. 2002) (citing Arvizu, 534 U.S. at

28  273).  A reviewing court's determination of reasonable suspicion is a process that "allows officers to

1   draw on their own experience and specialized training to make inferences from and deductions about

2   the cumulative information available to them that 'might well elude an untrained person.'" <u>Arvizu</u>,

3   534 U.S. at 273 (<u>citing</u> <u>Cortez</u> 449 U.S. at 418).  The Fourth Amendment is satisfied if an officer's

4   action is supported by reasonable suspicion to believe that criminal activity may be afoot and

5   observation of factors which are by themselves consistent with innocence may collectively amount to

6   reasonable suspicion.  <u>Id.</u> at 273-74.  Reasonable suspicion is not a matter of hard certainties, but of

7   probabilities.  <u>Cortez</u>, 449 U.S. at 417-18.  However, reasonable suspicion requires more than an

8   officer's "hunch" even if the hunch later turns out to be a good one.  <u>Terry</u>, 392 U.S. at 27.  The

9   reasonable suspicion standard is less than a preponderance of the evidence.  <u>United States v. Sokolow</u>,

10   491 U.S. 1, 7 (1989).

11         In <u>Adams v. Williams</u>, the Supreme Court explained its holding in <u>Terry</u> as follows:

12            In <u>Terry</u>, this Court recognized that a police officer may in appropriate
13            circumstances and in an appropriate manner approach a person for purposes
of investigating possible criminal behavior even though there was no
probable cause to make an arrest.  The Fourth Amendment does not require
14            a policeman who lacks the precise level of information necessary for
probable cause to simply shrug his shoulders and allow a crime to occur or
15            a criminal to escape.  On the contrary, <em>Terry</em> recognizes that it may be the
essence of good police work to adopt an intermediate response.
16            A brief stop of a suspicious individual, in order to determine his identity or
to maintain the status quo momentarily while obtaining more information,
17            may be most reasonable in light of the facts known to the officer at the time.

18   407 U.S. 143, 145-147 (1972) (citations omitted).

19         Both the Supreme Court and the Ninth Circuit have held that the whether location in which a

20   defendant is observed is a "high crime area" is relevant and can contribute to a reasonable suspicion

21   analysis.  <u>See</u> <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124-25 (2000); <u>United States v. Montero-Camargo</u>,

22   208 F.3d 1122, 1138-39 (9th Cir. 2000) (recognizing relevance to reasonable suspicion analysis but

23   cautioning its application "because such a description [as a high crime area], unless properly limited

24   and factually based, can easily serve as a proxy for race or ethnicity").

25         During an investigatory detention, an officer may frisk an individual for weapons where she has

26   reason to believe that she is dealing with an armed and dangerous individual.  <u>Terry</u>, 392 U.S. at 27.

27   <u>Terry</u> held:

28   / / /

1
2
3
4
5
6

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, wherein the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

7    Id. at 30.

8         The Ninth Circuit has "identified a wide variety of factors that can support a reasonable belief

9    that an individual is armed." United States v. Flatter, 456 F.3d 1154, 1157 (9th Cir. 2006). Significant

10   weight is given to an officer's observation of a visible bulge in an individual's clothing that could

11   indicate the presence of a weapon. Id. Sudden movements, or repeated attempts to reach for an object

12   that is not immediately visible may give rise to a reasonable suspicion a defendant is armed. Id. at

13   1158. The nature of the crime suspected, and whether it is associated with weapons may create

14   reasonable suspicion for a pat down search. Id. However, to comport with the Fourth Amendment, a

15   police officer must have more than a reasonable belief that if the individual with whom contact is made

16   is armed, he or she would be dangerous. Id.

17        The court finds that the officers who stopped Rafus at the Taco Bell conducted an investigatory

18   detention which was based on reasonable suspicion. On August 20, 2008, the officers involved in this

19   case made arrangements through a confidential informant to make a controlled buy from Kenneth

20   Andrew Palmer in the parking lot of the Boulevard Mall. The area surrounding the Boulevard Mall is a

21   high crime area commonly referred to as "crack alley." Palmer arrived in the parking lot of the

22   Boulevard Mall and was observed driving a white van by surveilling officers. An individual later

23   identified as Rafus parked a red BMW next to Palmer's white van, got out of the BMW, and entered the

24   van. Rafus stayed in the van for a short period of time, got out, and dropped something on the ground

25   which Special Agent Webster testified was a white baggie with a knot in it, consistent with the way

26   narcotics are packaged. Webster observed the person later identified as Rafus put the baggie in his

27   shorts' pocket and get back into the red BMW.

28   / / /

23

1    Approximately ten officers were surveilling the area of the Boulevard Mall for a controlled buy

2  which was supposed to take place between Palmer and the CI.  During the surveillance, one of the

3  officers, probably Gorup, called out over the radio that the individual in the red BMW might be Rafus.

4  Although the testimony was conflicting and no one could definitively say who called out over the radio

5  that Rafus might be in the BMW, the court finds that one of the officers did.  The court found this

6  testimony credible because it is the most reasonable explanation for why the officers deviated from their

7  operational plan and sent four units to pursue Rafus, leaving the remaining officers in the parking lot of

8  the Boulevard Mall.  Deviating from the initial plan put all of the officers involved in the investigation

9  at additional risk.  Many of the officers involved in the August 20, 2008 surveillance and investigation

10  were also involved in the July 14, 2008 execution of search warrants at the Shelter Island Apartments.

11  During the execution of that warrant, Rafus was arrested in one of the apartments that were searched for

12  drugs and guns and grabbed one of the officer's weapons.  The court, therefore, believes that the

13  officers decided to pursue Rafus because they believed he was the individual involved in the prior

14  search who had been arrested with guns and weapons and who had grabbed another officer's weapon.

15    Under all of these circumstances, the court concludes the officers had reasonable suspicion to

16  believe that a drug transaction had occurred between the occupant of the van and the occupant of the

17  red BMW.  The court is mindful of the multiple discrepancies in the testimony of the various officers

18  concerning exactly where they were and what their vantage point was during different points in their

19  surveillance of what was supposed to be a drug deal between Palmer and the CI.  The court is also

20  cognizant that many of the facts testified to by the law enforcement officers in this case did not make

21  their way into the various reports.  However, the court's duty in deciding this motion is to determine

22  whether reasonable suspicion supported the initial stop, not whether the government can prove its case

23  beyond a reasonable doubt to a jury's satisfaction.  The court has had the opportunity to review the

24  surveillance tape, and there is no question that the red BMW parked next to Palmer's white van at the

25  same time the CI was supposed to make a controlled buy from Palmer.  There is also no question that

26  there were multiple officers surveilling the transaction, one of whom, Webster, had a direct line of sight

27  to the BMW.  Under the totality of the circumstances, the court is persuaded that the collective

28  / / /

1  knowledge of the officers involved in this investigation constituted reasonable suspicion to stop Rafus

2  for an investigatory detention of a drug transaction.

3       Additionally, the court finds the officers had reasonable suspicion to frisk Rafus for weapons.

4  In this case, ten officers were investigating what was supposed to be a drug transaction between Palmer

5  and a confidential informant.  When they observed the occupant of the red BMW, whom they believed

6  was Rafus, they deviated from their operational plan.  Four units broke off surveillance at the Boulevard

7  Mall to pursue and stop Rafus at the Taco Bell.  The officers reasonably believed that Rafus was an

8  occupant of the red BMW.  The officers were aware that Rafus had been arrested on July 14, 2008 in an

9  incident in which he had struggled with a police officer and attempted to take his gun.  Under these

10  circumstances, the officers were justified in frisking him for weapons.

11      **2.**    <u>**Arrests**</u>

12       The most intrusive level of contact between a citizen and a police officer is an arrest.  An arrest

13  is a seizure which must be supported by probable cause.  <u>Adams</u>, 407 U.S. at 148-49.  There is no

14  bright line rule for determining when an investigatory detention is converted into a full fledged arrest.

15  <u>United States v. Sharpe</u>, 470 U.S. 675, 685 (1985); <u>United States v. Robertson</u>, 833 F.2d 777, 780 (9th

16  Cir. 1987); <u>Washington v. Lambert</u>, 98 F.3d 1181, 1185 (9th Cir. 1996).   The determination of whether

17  a <u>Terry</u> stop has been converted into a full fledged arrest requires an examination of the totality of the

18  circumstances surrounding the encounter, and each case must be decided on its own facts.  <u>United</u>

19  <u>States v. Parr</u>, 843 F.2d 1228, 1231 (9th Cir. 1988).  "Pointing a weapon at a suspect, ordering him to

20  lie on the ground, handcuffing him, and placing him for a brief period in a police vehicle for

21  questioning – whether singly or in combination – does not automatically convert an investigatory

22  detention into an arrest requiring probable cause."  <u>Allen v. City of Los Angeles</u>, 66 F.3d 1052, 1056

23  (9th Cir. 1995).  "The use of force in making a stop will not convert the stop into an arrest 'if it

24  occurs under circumstances justifying fears for personal safety.'"  <u>Id.</u> (quoting <u>United States v. Jacobs</u>,

25  715 F.2d 1343, 1345-46 (9th Cir. 1983)).  The ultimate inquiry is whether a reasonable person would

26  believe himself to be under arrest, and the Ninth Circuit focuses on whether the police had their guns

27  drawn, whether the defendant was handcuffed, whether the defendant's liberty was restricted, and the

28  number of officers that were present.  <u>Lambert</u>, 98 F.3d at 1186, 1188-90.

1    The court has found that the initial stop was based on reasonable suspicion.  Rafus was
2  unquestionably ordered out of the vehicle at gunpoint and immediately handcuffed.  Pointing a weapon
3  at him and handcuffing him did not automatically convert the initial investigatory detention into an
4  arrest.  The court has also found that the officers had reasonable suspicion to conduct a patdown of his
5  person for weapons.  A patdown was conducted immediately after he was ordered out of the vehicle and
6  handcuffed.  During the patdown of the exterior of his clothing, Special Agent Gillespie lifted the
7  handcuffs to patdown the waistband area.  In do so, he observed a plastic baggie protruding from the
8  defendant's front shorts' pocket.  The observation of the plastic baggie in Rafus' front pocket, together
9  with the observations made in the parking lot of the Boulevard Mall of Rafus entering and leaving
10  Palmer's van and dropping a plastic baggie containing a white powdery substance, as well as the
11  officers' training and experience, established probable cause for his arrest.  The court examined the
12  shorts Rafus was wearing.  They were large and baggy and had a large front pocket.  The court,
13  therefore, found Special Agent Gillespie credible that it was immediately apparent that the baggie
14  contained contraband.

### CONCLUSION

16    Rafus was stopped in an investigatory detention based on reasonable suspicion which developed
17  probable cause for an arrest.  Under the totality of the circumstances, the officers had reasonable
18  suspicion to believe that Rafus might be armed and dangerous based on their prior contact with him
19  during the incident on July 14, 2008.  The officers observed the contraband in his right shorts' pocket
20  while patting down the exterior of his clothing for weapons.

21    For all of the foregoing reasons,

22    **IT IS THE RECOMMENDATION** of the undersigned United States Magistrate Judge that
23  Rafus' Motion to Suppress (Dkt. #10) be DENIED.

24    Dated this 24th day of August, 2009.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE

26